Jeremy B. Sporn
Federal Defenders of Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920

Attorneys for the Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
The Honorable SALVADOR MENDOZA, JR.

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>        v.<br><br>Juan C. Sandoval-Guerrero,<br><br>                    Defendant. | Case No. 4:20-cr-6009-SMJ<br><br>**Memorandum in Aid of Sentencing and Motion for Downward Variance**<br><br>Richland - With Oral Argument<br><br>July 29, 2021, at 10:15 |

The defendant, Juan C. Sandoval-Guerrero, has spent the last 18 months chastened, embarrassed and afraid.  His arrest and prosecution stems from befriending two young boys on an online gaming platform and convincing them to take sexually explicit photographs or videos of themselves and send them to him.  That it was wrong, and that the victims and their family were wronged are givens; saying that adds little to the discussion.  That it is was impulsive, reckless, aberrant, self-destructive, immature and terribly naïve adds somewhat more to the considerations inherent in the criminal sentencing process.  But that does not begin to describe the despair, heartbreak and heartache that his actions have engendered for all concerned.

Memorandum in Aid of Sentencing and Motion for Downward Variance

1

The sheer folly of Juan's actions over a brief period of time in the Fall of 2019, when he was turning 20, cannot be overstated.  Whatever poor decisions we all make at that age usually do not affect us for life.  Sadly, Juan's crime will cast an outsized shadow on the rest of his life, and on his family as well.  He will remain incarcerated at least until his 30s, at which point he will be likely deported to a country he left before the age of one, and where he knows virtually no one, save his father, with whom he does not have much of a relationship.  The statute of conviction confines the exercise of this Court's individualized sentencing discretion to between fifteen and thirty years in prison.  For the following reasons, a sentence in excess of fifteen years in prison would be more than necessary to achieve the purposes of sentencing.

## I. Base Offense Level and Enhancements

The sentencing guidelines set the base offense level for production of child pornography, under Section 2251(a) at 32, which the PSR correctly calculates.  From there, it adds a number of enhancements almost inherent to the offense, baked in to the crime.  For the most part, there is little dispute about these enhancements as a matter of Guideline calculation.  Whether they actually help produce a reasonable and just sentence is a separate consideration, addressed more fully below.

Four levels are added because the victim was under 12, [Ch. 2G2.1(b)(1)], and another two levels are added because the offense involved the internet or an interactive computer service under Chapter 2G2.1(b)(6).  Under Chapter 4B1.5(b), another five

Memorandum in Aid of Sentencing and Motion for Downward Variance

levels are added because Mr. Sandoval-Guerrero's conduct meets the Guideline definition of a pattern of activity prohibited sexual conduct. The effect of this enhancement is lopsided relevant to the conduct, but at least appears correct as a matter of Guidelines interpretation. Already we are at a Guideline recommendation of life, well beyond the statutory maximum of thirty years. But the Guidelines are not yet finished with Mr. Sandoval-Guerrero.

Two additional enhancements for engaging in knowing distribution, and for the commission of a sexual act are also included in the PSR (at paragraphs 57-58) to which Mr. Sandoval-Guerrero objects, and which should be stricken. These are addressed in his separately-filed PSR objections, and there is no need to repeat the arguments here. From there, three levels are taken off for Mr. Sandoval-Guerrero's decision to accept responsibility and plead guilty. If the Court grants his objections as to the two disputed enhancements, it would create an adjusted offense level of 40, and an advisory range of 292-360 months (reduced by five months because of the statutory maximum). That range is still excessive, for the reasons addressed below, but it is a more reasonable starting point.

## II. Departures

The draft PSR does not identify any applicable departures, although it does recognize (at ¶ 137) that the estimated Guideline range here appears overly harsh. But several potential departures should be in play. First, the Guidelines recognize that "Age

Memorandum in Aid of Sentencing and Motion for Downward Variance

(including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. Ch. 5H1.1. Cases have tended to be stingy in applying this departure, particularly as applied to the young (as opposed to older defendants), although it was liberalized in 2010 to make it less restrictive and to recognize that youth may sometimes be relevant.

Indeed, Mr. Sandoval's youth, 19 or 20, (and a *young* 19 or 20, at that) distinguishes this case from the typical case under the same statute, which will generally involve an older, more predatory defendant, at times who has committed similar misconduct in the past. *See United States v. McElheney,* 524 F.Supp.2d 983, 997 (E.D.Tenn. 2007) ("Typically, defendants in [child pornography] cases are first offenders, highly educated, middle aged, with solid work histories."). Juan hardly meets this profile, with the exception of being a first offender. He is, in almost all respects, just a child himself, barely out of high school, whose hobbies were the same as a child's. In these types of cases, judges have recognized the extent to which such factors call for a departure or variance, and take cases out of the heartland they are supposed to embody. *See, e.g., United States v. Polito*, 215 Fed. Appx. 354, 356-57 (5th Cir. 2007) (affirming probationary sentence for child pornography offender who was 18 at the time, and "and very immature...and his age and mental condition prohibited him from acting

rationally"); *United States v. Allen*, 250 F. Supp. 2d 317 (S.D.N.Y. 2002) (granting downward departure for 21 year old who functioned more like 14 year old, because his limited mental capacity and immaturity take his case out of the heartland of drug and gun distribution).

Similarly, Chapter 5H1.3 authorizes a departure on account of a defendant's mental or emotional condition.   Perhaps the best reflection of Mr. Sandoval-Guerrero's functioning in this regard, apart from observing him in Court and reviewing Dr. Klein's psychological evaluation [attached, along with his CV as Exhibits 1 & 2] is the recorded interview with law enforcement after Juan's arrest.  Attached Exhibit 3.  It is painfully apparent that Mr. Sandoval-Guerrero's naivete and lack of sophistication were important causal factors in the offense conduct.  Whether this rises to the formal level of a Guideline departure under this or another section, or whether it is more the manifestation of a child-like disposition (as opposed to an actual mental or emotional condition) is less than clear. What *is* clear, is that the Court, whether through the formality of a Guideline departure, or the post-*Booker*, more informal 3553(a) variance route, account for Mr. Sandoval-Guerrero's youth, immaturity, and child-like qualities by imposing a reduced sentence relative to whatever the advisory Guideline range becomes.

Memorandum in Aid of Sentencing and Motion for Downward Variance

### III. The 3553(a) Factors Caution a Minimum Sentence

### A. Mr. Sandoval-Guerrero's History and Characteristics

As mentioned, Juan was just 19, turning 20, at the time of the offense conduct. He is a sweet, child-like, naïf.  He is neither malicious nor venal.  Juan is thin, with a frail physique, and an extremely soft-spoken disposition.  In a setting that prioritizes machismo and masculinity, he exhibits neither in abundance.  He is trustful towards authority, and a religious young man.  By virtually every measure, he is just a kid, still bewildered by his nightmarish odyssey through the criminal justice system.  Before this case, Juan had never been arrested.

Mr. Sandoval-Guerrero was born in Mexico, the second youngest of four children.  He was brought to the United States at the age of less than a year.  As a child, he was sickly and had a rocky start from a physical standpoint.  The family first lived in California, then moved up to Washington.  At 11, Juan's parents separated following physical abuse and altercations, and his father was deported to Mexico.  Juan took it hard, and became depressed.

In school, Juan wrestled, and had a couple girlfriends, but was not especially popular.  Nor was he a particularly good student, instead struggling academically.  Still, Juan managed to graduate high school, and began working at a fruit manufacturing concern in Prosser.  Before that, and while still in school, Juan worked in local orchards to help buy school supplies.  He was still living at home with his brother or mother, and

Memorandum in Aid of Sentencing and Motion for Downward Variance

online gaming was his hobby.  To Juan's credit, he managed to avoid many of the pitfalls of life in the lower-Valley.  Until this case.

Juan's older sister describes him as the life and love of their family, beloved by all those who know him.  It is easy to see why.  He is humble and kind.  They remain extremely supportive, and are working on support letters, and will be present at sentencing for him.  Following the arrest here, both Mr. Sandoval-Guerrero and his family were troubled; he feels he let them down and they would be better off without him, and they blame themselves in part for Juan's ordeal.  After Juan's arrest, he took the opportunity to write a letter to the victims' family apologizing for what he had done, although it seems it was little more than a ruse to get Mr. Sandoval-Guerrero to incriminate himself.  Still, he continues to express empathy, and indicates they did not deserve the corruption he visited upon them, and that he hates himself for his actions. PSR ¶¶ 51-52.  Juan's sense of regret and sadness is palpable when talking with him, not just for the effect his actions have had on his own life, but for the way his conduct has affected the victims of his offense.

When COVID-19 swept through Juan's pod at the Yakima County Jail, his concern was for his family, and how they were dealing with the difficulties of the pandemic.  And they were worried about him.  Juan's sister indicates he has always been the baby of the family, and speculates that feelings of loneliness led to the offense

Memorandum in Aid of Sentencing and Motion for Downward Variance

conduct.  She confirms that mentally, he was a "little behind" and that while he is now 21, Juan is more like a little kid in many respects.

Dr. Klein, in his evaluation, indicates that Mr. Sandoval-Guerrero was not cognitively sophisticated.  Exhibit 1 & 2.  Dr. Klein summarizes that Juan:

> had no prior criminal history, has never physically molested anyone, and did not perceive that his exchange of video images with the two boys (brothers) could be characterized as an illegal act. Note that at age 14, your client exchanged video images with two friends (both also age 14 at the time) and no one got in trouble (with the law or in any other sense of the term). At the time of the subject incident, he didn't grasp that this was different, either legally or any other way. Since his arrest and incarceration, he has been told about how his age (adult status as compared to the minor status of the brothers) makes it different, and indeed improper.  He was not intending to harm anyone. He certainly does not appear to present a risk of reoffending. He knows not to repeat this action and demonstrates no irresistible drive state to do so. Further incarceration will not achieve any benefit for the community at-large. The point has already been driven home to Mr. Sandoval-Guerrero, who remains fearful and chastised.

## B. These Qualities Call for Mitigation

We often hear about the folly of youth.  That folly takes different forms; excess drug or alcohol use, reckless travel and adventurism, utopian political visions, or just doing dumb things that would make the same person (the undersigned, for example) cringe once they acquire a bit of maturity, wisdom and life experience.  Perhaps this minimizes the gravity of this offense.  However, but for Mr. Sandoval-Guerrero's youth, immaturity and lack of sophistication, this offense would not have occurred.

These issues are surely relevant to his culpability.  *See United States v. Stern*, 590 F. Supp. 2d 945, 952 (N.D. Ohio 2008) (varying downward to 12 months from 46-57

month guideline range in child porn case because seriousness of offense tempered by defendant's immaturity and teenaged actions[1]). That Mr. Sandoval-Guerrero knew the conduct was wrong on some level, morally, legally or otherwise, seems clear. Yet he did fully appreciate the wrongfulness of his conduct, nor the devastating legal consequences that it carries. Nor did he reflect on the impact such conduct would have on the victims and their families. A lack of awareness or realization as to the socially unacceptable nature of child pornography or other related conduct helps mitigate punishment, to some extent. *See United States v. Gifford*, 17 F.3d 462, 475 (1st Cir. 1994).

Further, that Mr. Sandoval-Guerrero's actions were manipulative and exploitative, and that he sought to conceal his wrongdoing from being discovered, does not change any of that. None of that suggests he was not childlike and immature himself. Sometimes, children manipulate and exploit. Sometimes they try to cover their tracks. Obviously as to conduct that is usually far less disturbing than that at issue here. But that is more a matter of degree than of kind.

Mr. Sandoval-Guerrero is characterized by his youth and immaturity, his shyness and child-like disposition. He is, in virtually all respects, just a kid. These

---

[1] The fuller quote from *Stern* is instructive: "Indeed, the Court has conducted a review of the scientific literature in this area and believes there is compelling evidence that the judicial system's longstanding principle of treating youth offenders differently than adult offenders is justified in part based on the unformed nature of the adolescent brain. *See, e.g.,* National Institute of Health Publication 4929, *The Teenage Brain: A Work In Progress* (2008))." 590 F. Supp. 2d at 952.

Memorandum in Aid of Sentencing and Motion for Downward Variance

qualities, which define him as much as anything else, including his attachment to family, are strong bases for mitigation, mercy and some degree of leniency.  *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 57-58 (2007) (endorsing sentencing court's treatment of defendant's youth and immaturity and that "district court's consideration of [such things] finds support in our cases"); *Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside").  *Johnson* aptly summarizes that youth is "a time and condition of life when a person may be most susceptible to influence and psychological damage." *Id.* at 367.  And, as the sentencing court in *Gall* noted, with a later Supreme Court imprimatur:

> lack of maturity and an undeveloped sense of responsibility [commonly found among the young] are qualities that often result in impetuous and ill-considered actions… Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five… . [T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Gall*, 552 U.S. at 58 (citing *Roper v. Simmons*, 543 U.S. 551 (2005)).  We appreciate that there may be some need for bright lines that distinguish adult from juvenile offenders. But

it is not as if when Mr. Sandoval-Guerrero turned 18 (or 19 or 20), some light switched on that gave him better judgment, maturity, insight and decision-making.

Over the last two decades, the Supreme Court has consistently been recognizing these principles.  It has confirmed and decided cases on the belief that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," including in "parts of the brain involved in behavior control[. ]" *Graham v. Florida*, 560 U.S. 48, 68 (2010); *see also Miller v. Alabama*, 567 U.S. 460 (2012); *Roper*, 543 U.S. at 569.  Juveniles have "diminished culpability and greater prospects for reform" and evidence a "lack of maturity and an underdeveloped sense of responsibility," which leads to "recklessness, impulsivity and heedless risk-taking." *Miller*, 567 U.S. at 471-72 (quoting *Graham*, 560 U.S. at 68 and *Roper*, 543 U.S. at 569). *Roper* recognizes that for young people, even the commission of heinous crimes does not necessarily evidence an "irretrievably-depraved character." 543 U.S. at 570.  Certainly that is the case with respect to Mr. Sandoval-Guerrero.

The Court's sentence should also account or Mr. Sandoval-Guerrero's vulnerability in the BOP environment.  To counsel's relief, Mr. Sandoval-Guerrero has fared surprisingly and relatively well in local custody thus far.  It helps that he is not far from his family, and that he is housed with other offenders facing or convicted of similar charges.  But these things may not be the case in the more cutthroat BOP environment, where those convicted of similar cases are sometimes targeted for exploitation, ostracism

Memorandum in Aid of Sentencing and Motion for Downward Variance

and abuse.  He is shy, withdrawn, mild-mannered, reserved, soft-spoken and passive.  Mr. Sandoval-Guerrrero's youth, immaturity, slight physical stature and sweet, child-like demeanor are not the best of qualities to accompany a defendant to prison.  Judges have long reduced sentences because of a defendant's individual characteristics or the nature of the offense (or both) as they relate specifically to custodial issues while in prisons. *See United States v. Shasky*, 939 F. Supp. 695 (D. Neb. 1996); *United States v. Ruff*, 998 F. Supp. 1351 (M.D. Ala. 1998); *United States v. Wilke*, 995 F. Supp. 828 (N.D. Ill. 1998) (departing downward on account of defendant's appearance and conviction for sex offense involving juveniles, as this subjects him to potential physical abuse in prison); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1204 (D.N.M. 2012) (reducing sentence in child porn case because "prison would have destructive and devastating effects" on the defendant "and would not be rehabilitating" and "may be subject to serious danger in prison").  As one commentator describes the landscape in custody:

> Prison is hell.  If there is anything in today's United States that may approximate Hobbes' state of nature, where men live in continual fear and danger of violent death by other men, and security is whatever man's own strength and invention enables, it must be the modern prison.  There, the war of all against all is not merely chaos, but, rather, reveals consistent patterns as the stronger inevitably subordinate the weaker.  One such undeniable pattern is the central and routine place of rape and its threat in the social system of the prison.

Jeannie Suk, *Redistributing Rape*, 48 AM. CRIM. L. REV., at 111 (Winter 2011).  We do not mean to engage in blatant fear-mongering, but surely these issues are of some concern.

Memorandum in Aid of Sentencing and Motion for Downward Variance

### C. <u>The Court Should Also Account for Likely Deportation</u>

Born in Mexico and brought to this country as an infant, Mr. Sandoval-Guerrero obtained lawful status here as a permanent resident.  But it likely will not matter; he is almost sure to be deported to Mexico once he is ultimately released from prison.  The path to staying in the United States is, barring some change in the law, extremely narrow, if walkable at all.  Juan's life, his family, and all his experiences are in this country.  He is a stranger in Mexico, where he would know only his father, and not very well.  The Court should take into account how being cast out of the United States will impact Juan and his family.

Likely removal from the United States affects different people in different ways.  For some, it is a desired outcome.  For others, it is a significant hardship, both to the individual defendants, and to their family members here in the United States.  *See Padilla v. Kentucky*, 559 U.S. 356, 364 (2010)  (noting that "deportation is an integral part – indeed, sometimes the most important part – of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes"); *United States v. Diaz-Aguilar*, 2015 U.S. Dist. LEXIS 108931, at *11-22 (E.D.N.Y. Aug. 24, 2015).  For Mr. Sandoval-Guerrero, it is likely to be a very difficult result, emotionally and practically.  We are not always sufficiently mindful of this type of collateral consequences.  *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (noting that "sufficient attention has not been paid at sentencing by me and lawyers – both prosecutors and

Memorandum in Aid of Sentencing and Motion for Downward Variance

defense counsel – as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant.").

But the Court should take that into account when formulating a just sentence. *See United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) (rejecting government's argument that pending deportation was an improper factor to consider and noting that sentencing court "may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family"); *United States v. Phillips*, 2015 U.S. Dist. LEXIS 101209, at *20 (E.D.N.Y. Aug. 3, 2015); *United States v. Chong*, 2014 U.S. Dist. LEXIS 135664, at *11 (E.D.N.Y. Sept. 24, 2014) ("Section 3553 should now be interpreted as requiring district courts to weigh the prospect of deportation . . . when imposing a sentence."); *see also United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.").

These are not new or novel thoughts.  James Madison long ago observed that:

> if the banishment of an alien from a country into which he has been invited, as the asylum most auspicious to his happiness — a country where he may have formed the most tender connexions, where he may have vested his entire property, and acquired property of the real and permanent, as well as the movable and temporary kind; where he enjoys under the laws a greater share of the blessings of personal security and personal liberty than he can elsewhere hope for[;] . . . if a banishment of this sort be not a punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied.

Memorandum in Aid of Sentencing and Motion for Downward Variance

14

James Madison, *Letters and Other Writings of James Madison* 526 (Cornell University Library 2009) (1865).  And even in ancient Rome, exile was considered so severe a punishment that it was an alternative to a death sentence: "This allows men who are on trial for their lives, if they are in the process of being condemned, to leave the country openly and thus to inflict a voluntary exile upon themselves[.]"  *See* Polybius, *The Rise of the Roman Empire*, Book VI: *On the Roman Constitution at its Prime*, ¶ 14; *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 n. 23 (1963) ("Banishment was a weapon in the English legal arsenal for centuries, 4 Bl. Comm. * 377, but it was always 'adjudged a harsh punishment even by men who were accustomed to brutality in the administration of criminal justice.' Maxey, *Loss of Nationality: Individual Choice or Government Fiat?* 26 Albany L. Rev. 151, 164 (1962)).  The Court should take its rightful place in this historical continuity by recognizing the devastating impact deportation and/or removal is likely to have on Mr. Sandoval-Guerrero and his family.  More years in prison would simply add to their pain.s

### D. The Guideline Recommendation is Flawed and Excessive

The Guidelines, of course, account for none of the foregoing considerations, and their failure to do so mocks their capacity to spit out individualized sentencing outcomes.  Deciding upon a just criminal sentence is hardly the mathematical, formulaic exercise the Guideline regime relies upon.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 512

(S.D.N.Y. 2006) (criticizing the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic"). The sentencing court's greater familiarity with the individual defendant and the circumstances of the offense before it gives it an institutional advantage over the Sentencing Commission in making an individualized sentencing determination. *See Gall v. United States*, 552 U.S. 38, 51-52 (2007); *Rita v. United States*, 551 U.S. 338, 357-58 (2007); *Koon v. United States*, 518 U.S. 81, 98 (1996). The Sentencing Commission, for its part, enjoys an institutional advantage because it has the resources and mission to compile and analyze empirical data and national experience on a systemic level. *See Kimbrough v. United States*, 552 U.S. 85, 109 (2007); *Mistretta v. United States*, 488 U.S. 361, 379 (1989).

Deference to the Guidelines, therefore, springs from their genesis as "the product of careful study based on extensive empirical evidence derived from review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46 (citing *Rita*). However, guidelines that do not take into account empirical data and national experience do not exemplify the Commission's exercise of its "characteristic institutional role." *Kimbrough*, 552 U.S. at 109; *Rita*, 551 U.S. at 348-50. *Kimbrough* and other cases make clear that the sentencing court may give ample effect to a policy disagreement with particular Guidelines, particularly those lacking such basis in empirical data and national experience, which are accordingly worthy of less deference. *See Kimbrough*, 552 U.S. at 100-10; *United States v. Henderson*, 649 F.3d 955, 961-64 (9th Cir. 2011).

Memorandum in Aid of Sentencing and Motion for Downward Variance

16

The applicable Guideline, at Chapter 2G2.1, is one such example.  That it lacks an empirical basis in data and national experience, the purported institutional role the Sentencing Commission was established to fulfill, is well-known and well-chronicled. *See, e.g.*, *United States v. Huffstatler*, 561 F.3d 694, 697 (7th Cir. 2009) (discussing various arguments as to the fallibility of the production Guideline and its genesis and development); *United States v. Jacob*, 631 F. Supp. 2d 1099, 1114-1115 (N.D. Ia. 2009) (categorically rejecting Chapter 2G2.1 because it did not result from empirical analysis but instead from congressional mandate that interferes with and undermines the Sentencing Commission's mandate); Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 1, 2009), available at ussc.gov.

Instead, Chapter 2G2.1 has been promulgated and amended over the years though Congressional directive across different pieces of legislation rather than through the Commission's inherent deliberative expertise.  *See* United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses* 249 (December 2012), available at ussc.gov; *see also Jacob*, 611 F. Supp. 2d at 1113-15 (chronicling how Ch. 2G2.1 "was not crafted pursuant to the Sentencing Commission's nationwide empirical study of criminal sentencing, but instead [through Congress'] mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses") (quoting *Huffstatler*, 561 F.3d at 696-97).  These

Memorandum in Aid of Sentencing and Motion for Downward Variance

cases analogize to the drug guidelines and crack sentencing, and judicial efforts to effectuate categorical policy disagreements. *See id.*   Because of its dubious origins grounded in politics and not empirical review, Chapter 2G2.1 is far less likely to reflect the 3553(a) factors than other Guidelines, and far more likely to recommend a term of years greater than necessary to achieve the purposes of sentencing.   Accordingly, judges have greater discretion to effectuate categorical policy disagreements with the draconian terms such guidelines conjure up. *See Kimbrough*, 552 U.S. at 89; *Spears v. United States*, 555 U.S. 261, 256-68 (2009).

Of course, many of these objections center around process or form, troubling in its own right, rather than substance. But the substance is problematic as well, and for multiple reasons.  For one, the application of overlapping enhancements makes little penological sense in the context of the offense, accounting for the nature of the crime and the harm the statute targets.  They are mostly inherent in the very nature of the offense, and quickly drive the advisory range to the statutory maximum, leaving little room for necessary differentiation amongst differing offenders.  This was one of Judge Bennett's primary concerns in *Jacob*: the 2G2.1 Guideline, like 2G2.2, "recommends enhancements for conduct present in nearly every case to which the guideline would apply," and then "unrealistically skews upward sentences for even 'average' defendants."  631 F. Supp. 2d at 1112-15; *see also United States v. Broxmeyer*, 699 F.3d 265, 299 (2d Cir. 2012) (Jacobs, J., dissenting) (lamenting that "many of the enhancements [in the same guideline] reflect no

Memorandum in Aid of Sentencing and Motion for Downward Variance

incremental evil beyond the base offense itself" and that in context, they apply in "no more than a literal, textual, mechanical, formalistic way.").

Second, and relatedly, the same Guideline covers an exceptionally broad range of conduct that differs significantly as to culpability. Congress intended to reach "as broad as possible a range of ways that a defendant might actively be involved in the production of sexually explicit depictions of minors[.]" *Ortiz-Graulau v. United States*, 756 F.3d 12, 19 (1st Cir. 2014); *see also United States v. Wright* 375 F.3d 935, 941 (9th Cir. 2004) (noting that production of sexually explicit materials is a crime that "covers a broad spectrum of behavior"). It follows that that elastic "range of ways" to violate the statute will implicate varying degrees of culpability as well. The means of violation and the potential effects thereof are not equally pernicious. For example, the defendant in *Wright* received a fifteen-year sentence[2], but "could have been sentenced for the production of material involving the sexual exploitation of a minor without repeatedly engaging in various forms of sex with an 11-month old infant." *Id.* The very idea that one common Guideline applies to the elasticity of the statute, is overly simplistic. This is the kind of

---

[2] That defendant received a 15-year sentence only because he cooperated and provided substantial assistance to the authorities. Otherwise, it surely would have been higher, as the conduct involved a grown man "inserting his erect penis into the rectum and mouth of his 11-month old son." *Id.* at 938. If that type of conduct, almost unimaginably egregious, results in a fifteen year sentence, asking for the same for Mr. Sandoval-Guerrero seems much more warranted.

Memorandum in Aid of Sentencing and Motion for Downward Variance

case that exposes the central conceit of the Guidelines as a poor dispenser of one-size-fits-all justice.

The production statute ranges from, for example, willing and consensual "sexting" with a 17 year-old on the one hand, to conduct exponentially more serious, disturbing, and culpable on the other end of the spectrum, worthy of more substantial moral condemnation. *See Broxmeyer*, 699 F.3d at 303 (noting that the "worst offenders" along a continuum of defendants charged with production offenses "force small children to engage in sexual and sadomasichistic acts, [] photograph or video the scene, and [] broadcast it to the world, leaving the children with the pain of the experience and the anguish of knowing that degenerates are gloating over their abuse and humiliation"); *United States v. Irey*, 612 F.3d 1160, 1167, 1209, 1220 (11th Cir. 2010) (describing defendant's horrific course of conduct over four years that Court determined warranted sentence at statutory maximum, described as "the worst of the worst," and contrasting it with more innocuous conduct).

Because of the ages of the victims here, Mr. Sandoval-Guerrero's remote conduct is not the least culpable violation of the statute, but it is substantially closer to that end of the spectrum, deserving less time in prison. Further, because Mr. Sandoval-Guerrero never engaged in any physical, non-remote contact with the victims, the conduct is outside of the heartland of a typical production offense. *See United States v. Parish*, 308 F.3d 1025, 1030-31 (9th Cir. 2002) (observing that the proper comparison is

Memorandum in Aid of Sentencing and Motion for Downward Variance

"with the conduct of other offenders of the same statute, and [] the 'heartland' to be determined is the heartland of the offense of possessing[3] child pornography"). Accordingly, a non-Guideline sentence is more warranted here. *See Kimbrough*, 552 U.S. at 109 ("[A] district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the heartland' to which the Commission intends individual Guidelines to apply.") (citing *Rita*, 551 U.S. at 351). We respectfully ask the Court to not lose sight of these realities in a troubling, challenging case.

In closing with respect to the Guidelines, we remind the Court it is "emphatically clear" that the Guidelines are *truly* advisory, *see United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (emphasis added), are not presumed reasonable, *see United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2008), and that they are merely one factor among many, cannot be ascribed more weight than the other statutory factors, and "constitute [] only a touchstone in the district court's sentencing considerations." *Id.* (citing cases); *United States v. Overton*, 573 F.3d 679, 699 (9th Cir. 2009). They produce an exceptionally long recommendation here, but should not become the basis for a sentence in this case.

---

[3] There are few cases that discuss the concept of a "heartland" production offense [as opposed to possession or receipt or distribution of child pornography], but most production cases seem to feature more egregious conduct involving actual sexual contact with minors.

Memorandum in Aid of Sentencing and Motion for Downward Variance

### E. **Other Considerations Warrant Leniency**

Judges have noted that unduly long prison sentences do not promote respect for the law but sometimes have the opposite effect. *See Gall*, 552 U.S. at 54 (quoting district judge's observation that long sentences "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing"); *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009) (finding it "certain that unduly severe punishment can negatively affect the public's attitude toward the law and toward the criminal justice system"); *Stern*, 590 F. Supp. 2d at 957 ("There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist"); *United States v. Ontiveros*, 2008 U.S. Dist. LEXIS 58774, at *6 (E.D. Wisc. July 24, 2008).

Relatedly, to the extent the Court's sentence has any deterrent effect on similarly-situated defendants or offenders (and there is reason to question why it would, given that such conduct is typically not a rational, deliberate, thoughtful decision), it would be as amply achieved with a minimum 15 year sentence as with a longer one. Put differently, a 25 or 30 year sentence, in context, does not constitute more of a deterrent than a 15 year one. As such, and like the balance of the other 3553(a) factors, a sentence

Memorandum in Aid of Sentencing and Motion for Downward Variance

beyond 15 years would be greater than necessary to achieve this goal or purpose in criminal sentencing. *See United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011) ("One of our most thoughtful jurists reminds us, "[o]ur resources are misspent, our punishments too severe, our sentences too long."). And as to individual deterrence, Mr. Sandoval-Guerrero, at this point, does not represent a danger to anyone. Further, his lack of criminal history and arrest history indicates he presents the least risk for recidivism or re-arrest. U.S. Sentencing Commission, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 14 (March 2017), available at ussc.gov.

It has been a long road for Mr. Sandoval-Guerrero, his family, and surely for the victim and his family as well. But we are hopeful that sentencing will bring some measure of closure to all. Certainly Mr. Sandoval-Guerrero will be haunted by his failings, but especially in light of his youth, exemplary history, and likely deportation, fifteen years in prison is enough. We ask respectfully for a sentence that accounts for the reality (and not just the caricature) of his misdeeds, but that tempers it with mercy and recognition of the hardships to come. *See United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) ("In deciding what sentence will be sufficient but not greater than necessary to further the goals of sentencing, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain"). Juan is in trouble and in pain, and we believe an excessive sentence here would simply add to his despair

Memorandum in Aid of Sentencing and Motion for Downward Variance

and give him little hope for a better future.  For these reasons, he respectfully asks for the minimum 15 year sentence.


Dated:   July 1, 2021

                      Respectfully submitted,

                      <u>S/Jeremy B. Sporn</u>
                      Jeremy B. Sporn, NY 4779310
                      Attorneys for Juan C. Sandoval-Guerrero
                      Federal Defenders of
                      Eastern Washington and Idaho
                      306 East Chestnut Avenue
                      (509) 248-8920
                       Email:  Jeremy_Sporn@fd.org

## CERTIFICATE OF SERVICE

      I hereby certify that on July 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: ALISON GREGOIRE, Assistant United States Attorney.

                      <u>S/Jeremy B. Sporn</u>
                      Jeremy B. Sporn, NY 4779310
                      Attorneys for Juan C. Sandoval-Guerrero
                      Federal Defenders of
                      Eastern Washington and Idaho
                      306 East Chestnut Avenue
                      (509) 248-8920
                      Email:  Jeremy_Sporn@fd.org

Memorandum in Aid of Sentencing and Motion for Downward Variance